## K & K JUMP START/CHARGERS, INC. and Bonnet Enterprises, LLC., Plaintiffs,

v.

## SCHUMACHER ELECTRIC CORP., Defendant.

### No. 98–0905–CV–W–6.

United States District Court,
W.D. Missouri,
Western Division.

Feb. 1, 2000.

Richard R. Johnson, Shook, Hardy & Bacon, L.L.P., Kansas City, MO, for plaintiffs.

Gerald M. Kraai, Litman, Kraai & Brown L.L.C., Kansas City, MO, for defendant.

### MEMORANDUM AND ORDER

SACHS, District Judge.

Plaintiffs K & K Jump Start/Chargers, Inc., and Bonnet Enterprises, LLC, brought this patent infringement action against defendant Schumacher Electric Corp. Schumacher sold a jump starter

known as the "INSTANT POWER." Bonnet owns a patent for allegedly the same device, which was invented in Canada by Karl Srol. Srol was issued an American and Canadian patent for his device, and he assigned these to Bonnet.[1] Bonnet, in turn, granted K & K an exclusive license to manufacture, sell, and otherwise use the device. K & K manufactures jump starters, but it supplies them exclusively to one company—Prestone Products Corp.

Schumacher now moves for summary judgment, arguing that one Kerry Sprouse of Ely, Nevada, invented the device at issue before Srol did. The Srol patent is invalid if the device it describes was first "made in this country by another," see 35 U.S.C. § 102(g) (1994), and invalidity is a complete defense to an infringement suit. See 35 U.S.C. § 282 (Supp. III 1997).

## I. *FACTUAL BACKGROUND*

The court views the evidence in the light most favorable to plaintiffs, the non-moving party. Plaintiffs do not dispute most of Schumacher's factual contentions and have not come forward with much contrary evidence to disprove them. Rather, plaintiffs argue that Srol's patent is presumed valid and that Schumacher has not overcome this presumption with the requisite "clear and convincing evidence" that Srol was not the first inventor.

### A. The Srol Patent

The Srol device is a "reusable safety cap for booster cable," and it operates as follows: the user inserts a cable clamp having spring-actuated clamping jaws (*i.e.*, the familiar "alligator clips" at the ends of jumper cables) into the device's "cap shell." Inside the "cap shell" is an "internal gripping tab," which keeps the clamping jaw in place. When the clamping jaw is thus insulated inside the "cap shell," it cannot come into contact with its companion clamping jaw, which is itself connected to a battery or other source of electrical current. See Defendant's Ex. 16 (Srol Patent).

Srol applied for a Canadian patent on May 6, 1991. He applied for a United States patent on November 5, 1991, and the U.S. patent was issued on February 2, 1993. The parties have not described the events surrounding Srol's development of the safety cap, but those events are not relevant to the present motion. Because of the law applicable at the time Srol received his U.S. patent, none of Srol's activities before May 6, 1991 (which took place in Canada), may be considered in determining whether he or Sprouse first invented the device. See 35 U.S.C. § 104 (1988); *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1561 (Fed.Cir.1996); *DSL Dynamic Sciences Ltd. v. Union Switch & Signal, Inc.*, 928 F.2d 1122, 1123 (Fed.Cir.1991).[2] Rather, the events surrounding Srol's creation of the safety cap "relate back" only to May 6, 1991, the date on which Srol filed a foreign patent application. Neither party argues otherwise.

### B. The Sprouse Patent

Labeled a "Protective Sheath for Electrical Cables," Sprouse's device is strikingly similar to Srol's.[3] The device consists of

---

1. Only the U.S. patent—No. 5,183, 402—is alleged to be infringed.

2. The relevant statute was amended as part of the North American Free Trade Agreement. See 35 U.S.C. § 104(a)(1) (Supp. III 1997). If the current version of § 104 applied to this case, then priority for the Srol patent could be established by reference to events in Canada that preceded the Canadian patent application. The parties agree that the former version of § 104 governs the present case.

3. The parties should not interpret the court's comparison of the two devices as a formal construction of the patent alleged to be infringed. In other papers not related to the pending motion for summary judgment, the parties have asked the court to conduct a hearing under *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), so that Claim 1 of Srol's patent (the only claim alleged to be infringed) may be construed before trial in order to aid the parties' preparations, and they urge competing constructions of Claim 1. A *Markman* hearing has indeed been scheduled, and the court will not construe Claim 1 until the parties have been fully heard.

a "sheath" made of plastic or hard rubber, and the user inserts the "live end of an electrical cable" (*i.e.*, an alligator clip of a jumper cable) into the sheath's interior (the "receptacle"). Inside the "receptacle," a metal "mounting plate" holds the alligator clip into place. The Sprouse sheath also contains an "attachment structure" on the exterior of the sheath; through the "attachment structure," the user clips the sheath, which houses one end of a jumper cable, to the insulated wire that is connected to the companion end of the same jumper cable. *See* Defendant's Ex. 1 (Sprouse Patent). With or without the "attachment structure," the two devices serve the same purpose. Plaintiffs do not dispute that the two devices are the same for purposes of this motion:[4] Srol's "safety cap" is equivalent to Sprouse's "sheath," Srol's "cap shell" to Sprouse's "receptacle," and Srol's "internal gripping tab" to Sprouse's "mounting plate."

The parties' dispute dealt with here centers instead upon the circumstances under which Sprouse invented his device and whether those circumstances have been proven by clear and convincing evidence. According to Sprouse, he developed the idea behind his "sheath" device during the Summer of 1989. He drew a design in a notebook, and the design is nearly identical to one of the diagrams in Sprouse's patent. Sprouse claims to have drawn the design that same Summer, but the diagram itself is not dated. Sprouse's drawing showed a "sheath" into which a jumper cable clamp could be inserted, and a "clamping bar" inside the sheath to hold the clamp into place. Sprouse next constructed a prototype of the device in late Summer or Fall 1989, or so he claims. The prototype consisted of a plastic milk carton and a hardened plastic coating (the sheath), and pliable metal tape (the clamping bar). According to Sprouse, the prototype worked "quite well," but he later lost the prototype during a move, and he does not know its whereabouts. Two friends of Sprouse have declared that he showed them the prototype in "strict confidence" during the Summer or early Fall of 1989. Both claim that the prototype was the same as the device in Sprouse's drawing (*i.e.*, Defendant's Ex. 3) as well as that diagramed in Sprouse's patent, that the sheath was made out of parts of a plastic milk carton, that Sprouse had dipped the sheath into a plastic material in order to stiffen it, and that both told Sprouse that the invention was a good idea. *See* Defendant's Ex. 27 (Declaration of Brett Porter), Ex. 28 (Declaration of Tony Adman). Sprouse's wife has issued a similar declaration. *See* Defendant's Ex. 29 (Declaration of Teresa Sprouse).

Sprouse then thought about patenting and marketing his device, but he took few tangible steps in this direction during the next year. After testing the prototype at home, Sprouse claims, he spoke with other people whom he thought might have some information on how to patent and advertise products. At some point during the Fall or Winter of 1989, Sprouse traveled to Salt Lake City and tried to conduct a search at the patent library there—only to be overwhelmed by the sheer volume of information that the preliminary search revealed. Sprouse's wife claims to have accompanied her husband on the research trip.

The next Summer, Sprouse contacted a company known as "Advanced Patent Services" to see if it could patent and market his invention. On or about October 26, 1990, Sprouse received various materials from APS, but Sprouse thereafter ceased dealing with APS after learning that an acquaintance had had bad results with that company. Sprouse's dealings with APS are documented by his own descriptions as well as the materials that Advanced sent to him in October 1990. Around the time

---

4. Plaintiffs have explained why they believe that the evidence concerning Sprouse's invention is not sufficiently corroborated to be "clear and convincing," but they do not argue that the two inventions are different, nor that defendant has not proven that the two devices are identical.

that Sprouse contacted APS, he also contacted Beldon Automotive to see if they might market his invention; Beldon manufactures and markets jumper cables. Sprouse contacted Beldon several times by telephone, and Beldon sent Sprouse a letter and "Information Release Agreement" in October 1990. Sprouse felt that the proposed agreement did not adequately protect his own interests, and he decided not to go forward with Beldon. As with Sprouse's correspondence with Advanced, his dealings with Beldon are documented by his own recollection as well as copies of the letter and "Information Release Agreement" sent to him in October 1990.

After his failed dealings with Advanced and Beldon, Sprouse sought the services of a patent attorney. On December 13, 1990, he met with Vaughn North of the Salt Lake City firm of Thorpe, North, and Western. That day, Sprouse gave North a notarized statement describing the invention as a "color coded shroud or bonnet constructed of a non-conductive material such as a hardened plastic which is attached near the end of a cable or wire for the purpose [of] sheathing and maintaining the position of the clamps and/or male or female connectors," *see* Defendant's Ex. 2, along with the drawing that Sprouse claims to have made during the Summer of 1989. Five days later, North requested the firm of Shlesinger & Myers of Arlington, Virginia, to conduct a patent search, and a letter dated December 18, 1990, documents this request. *See* Defendant's Ex. 10. On or about January 6, 1991, Sprouse received an interim invoice from North's firm; the invoice shows the conference between Sprouse and North on December 13, 1990, as well as the anticipated cost of the patent search and opinion. *See* Defendant's Ex. 6. North's firm

received Shlesinger's patent search report on January 22, 1991, and the record contains a copy of the report and an invoice. *See* Defendant's Ex. 12. North thereafter reviewed the patent search and informed Sprouse by letter on January 30, 1991, that he believed Sprouse's device was likely patentable and that his firm would go forward with a patent application in return for a retainer. *See* Defendant's Ex. 13. The dealings between Sprouse and North are evidenced by Sprouse's description of them, a declaration by North, and the various documents described above.

After receiving North's letter, Sprouse decided to go forward with a patent application. An initial draft of the application was prepared by one B. Geurts, an associate of North, on February 27, 1991. North reviewed the initial draft and suggested various changes to it. On April 26, 1991, North sent Sprouse the revised draft of a patent application for "Protective Bonnet for Electrical Cables." This communication is documented by a copy of North's letter transmitting the draft as well as North's and Sprouse's recollections. *See* Defendant's Ex. 7. According to both North and Sprouse, Sprouse thereafter suggested changes to the application by marking them upon the draft or drafts, by making telephone calls, and by way of letter; both have made sworn statements to this effect, and an undated letter that North claims to have received at some point before June 6, 1991, describes various suggested "selling points" as to the device's usefulness.[5] *See* Defendant's Ex. 14; Ex 23 (North Declaration) ¶¶ 14–16; Ex. 21 (Sprouse Statement) at 37–40; Ex. 26 (Sprouse Depo.) at 88–100. North received those changes, revised the application accordingly, and sent the again-re-

---

**5.** The letter was sent along with a check for $1100, and an invoice requesting payment of a balance of $1100 was sent to Sprouse on April 29, 1991. *See* Defendant's Ex. 8. One might therefore infer that North received the letter at some point between April 29, 1991 and June 6, 1991—during the time that he was editing and otherwise completing Sprouse's patent application. Nevertheless,

because plaintiffs are entitled to the benefit of all reasonable inferences that can be drawn from the evidence, the court will assume that the undated letter was written on June 6, 1991 (which leaves unresolved the question of what Sprouse was doing between April 26, 1991, and May 28, 1991,—see *supra* Part II A 3).

vised application to Sprouse on May 28, 1991—along with a transmittal letter, a Declaration & Power of Attorney, and a "Verified Statement of Small Entity." *See* Defendant's Ex. 20.[6] Sprouse thereafter executed the documents that North had sent him, and he mailed these back to North, who received them shortly before June 6, 1991. On June 6 (one month after Srol filed his Canadian patent application), North sent the patent application documents to the U.S. Patent and Trademark Office. The summary judgment record contains copies of these documents along with a transmittal letter. *See* Defendant's Ex. 15. The documents reached the Patent Office on June 10, 1991—the official filing date. Finally, U.S. Patent No. 5,166,478 was issued to Sprouse on November 24, 1992.

### C. The Relationship Between the Parties

The parties to this lawsuit have a previous commercial relationship. During late 1996 or early 1997, K & K supplied Schumacher with a private label jump starter called the "INSTANT POWER." The "INSTANT POWER" contained the safety device described in Srol's patent. During June 1997, however, K & K entered into an exclusive agreement to supply jump starters to Prestone, and it therefore ceased selling the "INSTANT POWER" to Schumacher. Schumacher made arrangements with another manufacturer, which agreed to supply it with the "INSTANT POWER" jump starter on a private label basis. *See* Defendant's Ex. 24. K & K and Bonnet thereafter commenced this action, asserting that Schumacher's "INSTANT POWER" jump starter infringed the Srol patent.

### II. ANALYSIS

In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, and it must give that party the benefit of all reasonable inferences to be drawn from the evidence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oney v. Ratliff,* 182 F.3d 893, 895 (Fed.Cir.1999). Summary judgment is appropriate only if the case presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The standard for summary judgment thus incorporates whatever substantive law governs the case at hand. *See id.* at 248, 254, 106 S.Ct. 2505. A patent is presumed valid, and proof of invalidity requires clear and convincing evidence. *See* 35 U.S.C. § 282; *Oney,* 182 F.3d at 895. Summary judgment is therefore proper only if a reasonable jury would *have* to conclude that clear and convincing evidence demonstrates the Srol patent's invalidity. *See Oney,* 182 F.3d at 895.

Defendant's burden on summary judgment is formidable but not insurmountable. Summary judgment is not *ipso facto* precluded by the fact that defendant bears the burden of proof upon the ground being urged or simply because a heightened standard of proof applies to that burden. Rather, if the evidence compels the conclusion that Sprouse invented the device in question before Srol did, then there remains no genuine issue of material fact to be resolved at trial. Nor does the "clear and convincing evidence" standard wholly relieve the nonmoving party of its usual burden on summary judgment, that is, to "set forth specific facts showing that there is a genuine issue for trial." *See Oney,* 182 F.3d at 895; Fed.R.Civ.P. 56(e).

Rather than directly contest Sprouse's account of his invention with contrary evidence, plaintiffs argue that Sprouse's story has not been proven by clear and convinc-

---

**6.** The various drafts of Sprouse's patent applications no longer exist because North's firm routinely destroys such drafts whenever a patent is issued.

ing evidence because it is not sufficiently corroborated. Plaintiffs, of course, are entitled to so argue even if they present no evidence of their own. Because substantive patent law limits the inferences that can be drawn from the testimony of one who claims to have previously invented a device that someone else patented (more on this later), summary judgment is not warranted by the mere fact that the evidence is decidedly one-sided. Nevertheless, plaintiffs may not rest upon conclusory assertions that defendant's theory is uncorroborated or otherwise unproven; at the very least, they must point to specific failures of proof which create specific factual issues for trial. *See* Fed.R.Civ.P. 56(e).

■ Central to defendant's evidentiary burden is the requirement that an alleged previous inventor's testimony must be corroborated in order to constitute clear and convincing evidence that he or she, rather than the patentee, first invented the device in question. The law has long required that evidence of invalidating activities (including previous inventions) be corroborated. *See Finnigan Corp. v. Int'l Trade Comm'n,* 180 F.3d 1354, 1366 (Fed.Cir. 1999); *Cooper v. Goldfarb,* 154 F.3d 1321, 1330 (Fed.Cir.1998); *Coleman v. Dines,* 754 F.2d 353, 359–60 (Fed.Cir.1985); *In re Reuter,* 670 F.2d 1015, 1021 (C.C.P.A.

1981); *Washburn & Moen Mfg. Co. v. Beat Em All Barbed–Wire Co.,* 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154 (1892).[7] The requirement itself addresses the law's concern that an inventor's testimony about previous activities is inherently unreliable: first, such testimony is likely to be inaccurate (because the witness tends to remember events as the party calling him or her would prefer to have them remembered, because memories fade, or because the witness's recollection might be colored or even falsified by his or her stake in the proceedings); second, it is implausible that an inventor would create a device without leaving behind a paper trail or other tangible evidence such as prototypes, schematics, "or other materials that typically accompany the inventive process." *Finnigan,* 180 F.3d at 1366–67 and n. 8; *Price v. Symsek,* 988 F.2d 1187, 1194–95 (Fed.Cir.1993).

■ The scope of the corroboration requirement is of particular importance to the pending motion for summary judgment. Although the rule requires independent corroboration of a purported inventor's story, it does not require corroboration of every minute detail of the inventor's testimony. *See, e.g., Cooper,* 154 F.3d at 1330 ("[A]n actual reduction to practice does not require corrobora-

---

**7.** A panel of the Federal Circuit recently called the corroboration rule into question by announcing that it applied only when the alleged previous inventor is a named party, is in privity with a named party, or is otherwise in a position to "directly and substantially gain by his or her invention being found to have priority over the patent claims at issue." *Thomson, S.A. v. Quixote Corp.,* 166 F.3d 1172, 1176 (Fed.Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 2395, 144 L.Ed.2d 796 (1999). Subsequent decisions have either returned to the rule as it was enunciated before *Thomson, see Oney,* 182 F.3d at 896–97, or have distinguished *Thomson* under circumstances suggesting that its holding may not be viable, *see Finnigan,* 180 F.3d at 1367–68 (stating that *Thomson* did not involve uncorroborated testimony and that *Thomson* therefore spoke only to the sufficiency of corroboration rather than its necessity *vel non*). Even though Sprouse is neither a party to this lawsuit nor

in privity with any, the safer course at this stage is for the court to operate under the assumption that the corroboration requirement still exists.

In any case, plaintiffs correctly point out that a judicial determination that Srol's patent is invalid might enhance the value of Sprouse's patent. In this sense, Sprouse might be in a position to "directly and substantially gain by his or her invention being found to have priority over the patent claims at issue." *See Thomson,* 166 F.3d at 1176. *See also* Katherine Kelly, *Corroboration Requirement Does Not Apply to the Oral Testimony of a Disinterested Prior Inventor,* 8 Fed. Circuit B.J. 74, 75–76 (1999) (predicting that few inventors or corroborators will be considered "disinterested," notwithstanding *Thomson* ). I question, however, whether Sprouse can be said to be a *direct* beneficiary of the defense in this case.

tion for every factual issue contested by the parties."). Rather, the question of whether an inventor's testimony is sufficiently corroborated is governed by a "rule of reason," under which "[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Price*, 988 F.2d at 1195; *Coleman*, 754 F.2d at 360. Absent the "rule of reason," it would be nearly impossible to prove that a patented invention is not novel, and the patent's validity would become conclusive rather than merely presumed. *See Knorr v. Pearson*, 671 F.2d 1368, 1374 (C.C.P.A. 1982) ("The law does not impose an impossible standard of 'independence' on corroborative evidence by requiring that every point of a reduction to practice be corroborated by evidence having a source totally independent of the inventor; indeed, such a standard is the antithesis of the rule of reason.").

■ The present motion is predicated upon Schumacher's argument that Sprouse invented the safety cap/sheath before Srol; in other words, the question is whether Sprouse or Srol has "priority of invention." A few definitions are in order. Priority of invention goes to the first party to reduce an invention to practice if that party does not thereafter abandon, suppress or conceal the invention; otherwise, priority is awarded to the party who reduced to practice second if that party nevertheless conceived first and exercised reasonable diligence in later reducing the invention to practice. *See* 35 U.S.C. § 102(g); *Cooper*, 154 F.3d at 1327; *Price*, 988 F.2d at 1190. "Conception" is defined as "the complete performance of the mental part of the inventive act. All that remains to be accomplished, in order to perfect the act or instrument, belongs to the department of construction, not invention. It is therefore the formation, in the mind of the inventor[,] of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice...." *Coleman*, 754 F.2d at 359 (quoting *Gunter v. Stream*, 573 F.2d 77, 80 (C.C.P.A.1978)).

■ Once an invention is conceived, a "reduction to practice" can be either actual or constructive. "To show an actual reduction to practice, an inventor must demonstrate that the invention is suitable for its intended purpose." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1578 (Fed.Cir. 1996). An actual reduction to practice does not require that the invention be in a commercially satisfactory stage of development—only that the invention works for its intended purpose or tackles the problem that it was created to solve. *See Buehler AG v. Ocrim S.P.A.*, 836 F.Supp. 1291, 1302 (N.D.Tex.1992). A constructive reduction to practice, by contrast, occurs when a patent application is filed. *Cooper*, 154 F.3d at 1327.

■ Abandonment, suppression or concealment occurs when an inventor unduly delays bringing the device to market or otherwise publicly disclosing the device after he or she has reduced it to practice. *See Checkpoint Systems, Inc. v. U.S. Int'l Trade Comm'n*, 54 F.3d 756, 761 (Fed.Cir. 1995). The question is whether an inventor's efforts to bring the invention to market accord with reasonable business practices. *Id.* at 761–62.

■ Finally, the law does not define the precise degree of "diligence" required of an inventor who conceives first but reduces to practice second. "All that can be said on the subject is that the conceiver's conduct between the conception and the reduction to practice must be reasonable under all the circumstances of the particular case in question." Ernest Bainbridge Lipscomb III, *Lipscomb's Walker on Patents*, § 3:16, at 247 (3d ed.1984). Diligence requires that the invention be reduced to practice "in a reasonably prompt manner, considered in light of all the attendant circumstances." *Diasonics, Inc. v. Acuson Corp.*, No. C–91–3118–DLJ, 1993 WL 248654, at *16 (N.D.Cal. June 24, 1993); the law permits interruptions occasioned by "reasonable everyday problems and limitations encountered by an inventor," and does not require the inventor to

"abandon his ordinary means of livelihood." *Griffith v. Kanamaru,* 816 F.2d 624, 626 (Fed.Cir.1987); *Courson v. O'Connor,* 227 F. 890, 894 (7th Cir.1915). As with other concepts in priority disputes, a previous inventor's diligence must be corroborated. *See Price,* 988 F.2d at 1196; *Sletzinger v. Lincoln,* 56 C.C.P.A. 1162, 410 F.2d 808, 811 (C.C.P.A.1969); *Loral Fairchild Corp. v. Victor Company of Japan, Ltd.,* 931 F.Supp. 1014, 1030 (E.D.N.Y.1996).

Defendant's motion proceeds under two theories, either of which warrants summary judgment if accepted. First, defendant argues that Sprouse actually reduced the safety cap/sheath to practice during the Summer of 1989 (well before Srol's priority date of May 6, 1991) when he developed a prototype, tested it at home, and found that it worked for its intended purpose—and that Sprouse did not thereafter abandon, suppress, or conceal his invention. Second, defendant contends, Sprouse conceived before Srol and exercised reasonable diligence from a date just prior to Srol's conception up to the time that Sprouse constructively reduced to practice by filing a patent application (*i.e.,* from a time just before May 6, 1991, to June 10, 1991). *See Mahurkar,* 79 F.3d at 1578. The second theory is the more straightforward of the two, and the court will address it first.

## A. Reasonable Diligence from Just Before Srol's Conception to Sprouse's Constructive Reduction to Practice

■ In order to prevail under its second theory, Schumacher must show that Sprouse conceived before Srol and that Sprouse exercised "reasonable diligence toward reduction to practice from a date just prior to the other party's conception to [Sprouse's] reduction to practice." *Mahurkar,* 79 F.3d at 1578. Otherwise stated, Sprouse (i) must have conceived at some point before May 6, 1991, and (ii) must have acted with reasonable diligence to reduce the invention to practice from a point just prior to May 6, 1991, up to June 10, 1991—when Sprouse constructively reduced to practice by filing his U.S. patent application. The time during which Sprouse must have been diligent is known as the "critical period." For Schumacher to prevail on summary judgment, the record must compel, not merely permit, the inference that clear and convincing evidence demonstrates that Sprouse conceived first and was diligent throughout the critical period. The relative shortness of the critical period does not change the standard, but it considerably narrows the evidence that must meet the standard.

### 1. Srol's and Sprouse's Conception Dates

Plaintiffs concede, as they must, that Srol's priority cannot depend upon any events before the filing of his Canadian patent application, or May 6, 1991, and that Srol's date of conception is therefore May 6, 1991, for purposes of this case. *See supra* Part I A; Plaintiffs' Opposition Suggestions at 7. The law as it existed when Srol's U.S. patent was issued permits him to establish priority with respect to filing his Canadian patent application, but he cannot rely upon any extraterritorial events that preceded the Canadian application. Thus, although Srol doubtless "conceived" his safety cap at some point well before he applied for a Canadian patent, his conception date must nevertheless remain May 6, 1991 for present purposes.

The parties likewise agree that Sprouse conceived well before May 6, 1991. Even ignoring defendant's argument that Sprouse conceived the device in 1989 at some point before making his drawing and prototype, the communications with Attorney North make it clear that Sprouse conceived no later than December 13, 1990— the date that Sprouse and North first met in person to discuss whether the sheath/bonnet should be patented. The meeting is evidenced by Sprouse's testimony, North's declaration, an invoice showing that the conference occurred, and especially by the notarized statement that Sprouse wrote for North on the date in question. The notarized statement described the de-

vice as "a color coded shroud or bonnet constructed of a non-conductive material such as a hardened plastic which is attached near the end of a cable or wire for the purpose [of] sheathing or maintaining the position of clamps and/or male or female connectors." *See* Defendant's Ex. 2. Sprouse may have conceived well before his meeting with North, but he certainly did so no later than December 13, 1990. Plaintiffs concede as much. *See* Plaintiffs' Opposition Suggestions at 4.

### 2. *Defining the Critical Period*

Since Sprouse conceived before Srol, Sprouse must have been diligent from a time just prior to Srol's conception up to the time that Sprouse reduced his invention to practice. Srol conceived on May 6, 1991, and Sprouse therefore needs to have diligently worked toward his patent application from just before this date to June 10, 1991.

### 3. *Sprouse's Diligence During the Critical Period*

The parties agree that on April 26, 1991, North sent Sprouse a draft of the patent application. They also agree that North sent a final version of the application to Sprouse on May 28, 1991, along with a transmittal letter, a "Declaration and Power of Attorney," and a "Verified Statement of Small Entity." Sprouse thereafter executed the documents and sent them to North, who sent them along to the Patent Office on June 6, 1991, where they were filed four days later.

The party charged with diligence must, with particularity, account for the entire period during which diligence is required, and the evidence of diligence must itself be corroborated. *See Gould v. Schawlow*, 53 C.C.P.A. 1403, 363 F.2d 908, 919 (C.C.P.A. 1966); *Loral Fairchild Corp. v. Victor Company of Japan, Ltd.*, 931 F.Supp. 1014, 1030 (E.D.N.Y.1996). The thirty-two day period from April 26, 1991, to May 28, 1991, is particularly troublesome. Sprouse testified that he reviewed the application carefully during the limited time available to him during this period, that he spent weekends and afternoons on the project because of his work schedule, and that he revised the application draft and forwarded his revisions to North. Sprouse's account is plausible but not overwhelmingly compelling. As Schumacher would have it, Sprouse's diligence is corroborated by North's declaration; the letters, bills and patent application prepared by North; the drawing and notarized disclosure submitted by Sprouse to North; North's use of the drawing in the patent application; and the Patent Office file history. But these documents do not explain why it took thirty-two days for Sprouse to read a draft patent application and suggest revisions, and for North to make these revisions and send the revised draft back to Sprouse.[8]

---

8. Sprouse's deposition suggests the possibility that he and North worked on numerous drafts. It appears that the draft of April 26 was not the first draft, since the letter accompanying it describes it as a "revised copy" of the application. *See* Defendant's Ex. 20. However, defendant has not produced any draft applications other than the one that was finally sent to the Patent Office, and North's office has a policy of destroying previous draft applications when a patent is finally issued. Moreover, Sprouse's testimony does not suggest the presence of more than one draft during the critical period. *See* Defendant's Ex. 26 (Sprouse Depo.) at 93. The court will therefore assume for the purposes of this motion that Sprouse and North worked on only a single draft from April 26, 1991, to May 28, 1991.

Of course, it is possible that North, rather than Sprouse, is responsible for most or all of any dilatory behavior that may have occurred between April 26 and May 28. If defendant could come forward with evidence that North's delay was reasonable in light of other matters that were before him at the time, this would strengthen its contention that Sprouse was diligent during the critical period. *See, e.g., Bey v. Kollonitsch*, 806 F.2d 1024, 1027–30 (Fed.Cir.1986) (delay in filing patent application excused where attorney worked on a group of related applications that "contributed substantially" to the preparation of Bey's application). But there is no evidence to support such a theory. Even accepting Sprouse's claim that he reviewed and revised the draft application of April 26, the record does not establish the point at which he forwarded the revisions to North. The court therefore cannot determine how much of the thirty-two day period was Sprouse's responsibility and how

The court is left with Sprouse's explanation that his demanding work schedule kept him from reviewing and revising the draft more expeditiously. This explanation suffers from two shortcomings. First, it is uncorroborated. Second and more importantly, even if the court were to accept this explanation at face value, it would not inexorably follow that Sprouse was so diligent that the issue should be taken from the jury. Even with a busy work schedule, thirty-two days may or may not be a commercially reasonable amount of time to spend reading and revising a patent application—even though an inventor need not abandon his or her means of livelihood in order to be "diligent" and even though the law requires only reasonable (and not heroic) diligence. Diligence is itself a factual question, and it depends heavily upon the particular circumstances of the case. *Bell Telephone Labs. v. Hughes Aircraft Co.*, 564 F.2d 654, 656 (3rd Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978); Lipscomb, *supra*, at 247.[9] Sprouse and Schumacher's account of events would very probably survive a motion for directed verdict if presented to a jury, but the evidence does not warrant summary judgment at this time. In other words, the present record and the "rule of reason" probably *permit* the inference, by clear and convincing evidence, that Sprouse worked diligently toward a constructive reduction to practice during the critical period, but this inference is not *required*. Summary judgment must therefore be denied on this ground. Finally, the court need not resolve the parties' arguments concerning whether Sprouse was diligent from May 28, 1991 (when he executed the finalized application and other documents and sent these to North), to June 6, 1991 (when North sent the application to the Patent Office).

## B. Sprouse's Claimed Actual Reduction to Practice of 1989

Schumacher's first theory requires clear and convincing evidence that Sprouse conceived and actually reduced his invention to practice and did not thereafter abandon, suppress or conceal it. Conception, reduction to practice, abandonment, suppression, and concealment are all questions of law. *See Price v. Symsek*, 988 F.2d 1187, 1190 (Fed.Cir.1993) (priority and conception); *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1567 (Fed.Cir.1996) (suppression and concealment); *Golden Star, Inc. v. Wilen Cos., Inc.*, 73 F.3d 381 (Table), No. 93–1567, 1995 WL 758787, at *2 (Fed.Cir. Dec.19, 1995) (abandonment). Nevertheless, the empirical contentions underlying these concepts are of course questions of fact (for example, the question of whether Sprouse did or did not construct a milk carton prototype in 1989). Here as elsewhere, Sprouse's testimony must be corroborated, and summary judgment is inappropriate unless clear and convincing evidence *requires* the inference that Sprouse invented the device before Srol.

The parties' arguments focus primarily upon Sprouse's contention that he constructed a prototype of the device out of a plastic milk carton and flexible metal tape during the Summer or Fall of 1989 and that the prototype worked well when tested. For now, the court will assume that Sprouse conceived the invention at some point prior to making the alleged prototype (after all, it seems that one cannot accomplish an actual reduction to practice without first conceiving). Whether Sprouse made the claimed prototype is a question of fact, and the issue is whether Sprouse's account is sufficiently corroborated. To this end, defendant relies upon the Sprouse's undated drawing of the device; the fact that the patent application con-

much was North's, much less how much of North's share of the delay was reasonable.

9. If Sprouse was aware he was possibly engaged in a "race to the courthouse" he might

well lose favor with the jury; in the absence of being so advised I suppose he may be likely to prevail.

tains a nearly identical drawing; and the declarations of Teresa Sprouse, Brett Porter, and Tony Adman. Notably absent is the prototype itself, which Sprouse claims to have lost during a move. More importantly, however, the evidence urged in support of Sprouse's story is not sufficiently independent of that story so as to warrant summary judgment. The three declarations come from Sprouse's wife and two close friends. The witness' relationships with Sprouse do not definitely undermine the credibility of their statements, but they cast some doubt upon whether Sprouse's testimony is corroborated with truly *independent* evidence. *See Oney v. Ratliff,* 182 F.3d 893, 895 (Fed.Cir.1999) ("The uncorroborated oral testimony of Mr. Ratliff, as the inventor, *and his close associates* would be insufficient to prove invalidity") (emphasis added); *cf. Kendall v. Searles,* 36 C.C.P.A. 1045, 173 F.2d 986, 993 (C.C.P.A.1949) (testimony of inventor's wife and son not sufficiently corroborative, where testimony was only of a general nature to effect that inventor worked continuously from time of conception). The testimony of Teresa Sprouse, Porter and Adman might well permit a jury to conclude, by clear and convincing evidence, that Kerry Sprouse developed a milk carton prototype in 1989, but it does not now require this conclusion.

Nor does Sprouse's drawing (and its resemblance to later drawings) warrant summary judgment. The drawing is itself undated, and the later drawings only establish that Sprouse had the same thing in mind when he applied for a patent as he did when he made the earlier drawing. The series of drawings do not prove *when* Sprouse made the earlier drawing, nor whether Sprouse ever made a prototype at all. To the extent that the drawing is relevant as to whether Sprouse made a prototype in 1989 (that is, the drawing makes this factual proposition more likely true than if there were no such drawing), its probative value is far from conclusive. In short, the drawing would not require the inference that Sprouse made the pro-

totype—even if aided by the declarations of Teresa Sprouse, Porter and Adman.

The parties also dispute whether Sprouse abandoned, suppressed, or concealed his invention after allegedly reducing it to practice. Schumacher argues that Sprouse engaged in a reasonable and continuous course of conduct designed to bring his invention to market: he and his wife attempted to conduct a patent search in Salt Lake City in late 1989, he contacted Advanced Patent Services and Beldon Automotive during the Spring of 1990 but chose to do business with neither, and he contacted a patent attorney in December 1990 in order to apply for a patent. Plaintiffs argue instead that even if Sprouse made a successful prototype during the Summer or Fall of 1989, Sprouse acted as though time was not crucial for some fifteen months thereafter and engaged in activities that were not reasonably calculated toward bringing the invention to the market or otherwise toward disclosing it to the public (that is, until he sought the services of Attorney North). The court declines to resolve this disagreement because doing so is unnecessary. So long as defendant cannot clearly establish that Sprouse actually reduced his invention to practice in 1989, it is not relevant whether Sprouse thereafter abandoned, suppressed, or concealed it.

## CONCLUSION

At trial, Schumacher may well convince a jury that Sprouse invented the safety cap/sheath before Srol did, but summary judgment is inappropriate at this time. "Summary judgments in favor of parties who have the burden of proof are rare, and rightly so," *Turner v. Ferguson,* 149 F.3d 821, 824 (8th Cir.1998). *Turner's* admonition applies with even greater force when, as here, a heightened evidentiary standard accompanies the burden of proof. Because the evidence does not compel the inference that Srol's patent is invalid by clear and convincing evidence, summary judgment must be denied. It is therefore

ORDERED that defendant's motion for summary judgment (Doc. 20) be denied. It is further

ORDERED that plaintiffs' motion to strike portions of defendant's reply brief (Doc. 32) be denied as moot.